FRANK FATH AND WIFE, PLAINTIFFS IN ERROR, v. WILLIAM J. THOMPSON, DEFENDANT IN ERROR.

1. The court, in the trial of an issue, is not required to rule upon abstract questions not dispositive of the rights of the parties. If the real issue be pointed out to the jury, the judgment will not be disturbed because of the judicial refusal to adopt some particular mode of presenting the issue, or to give conclusive effect to otherwise faultless legal formulæ applicable to a group of facts isolated from the rest of the cause.

2. Whether testimony shall be ruled upon before it is actually delivered is a matter that rests in sound judicial discretion.

3. Where testimony has been given without objection, and no motion to strike out has been made, acquiescence in its introduction will be presumed.

On error to Supreme Court.

This case was tried at the Camden Circuit Court before Hon. Richard T. Miller, Circuit judge, and a jury, and a verdict rendered for the plaintiff.

For the plaintiffs in error, *David J. Pancoast.*

For the defendant in error, *Alfred Hugg, Frederick A. Rex* and *George M. Robeson.*

The opinion of the court was delivered by

GARRISON, J. This is an action of ejectment brought by Thompson against Fath for the possession of a narrow strip of land lying along the river Delaware at Gloucester City and forming the easterly bank of the river at that point. The *locus* has as its westernmost boundary a stone wall, upon the westerly face of which the river Delaware marks high water. Possession of this *ripa* is claimed by Thompson, the plaintiff, as the grantee of William Hugg the elder, by virtue of sundry conveyances of "The Fishery" which the said Hugg owned in connection with the land that extended along and back from the river. To this same grantor, the defendant Fath traces his right, claiming title through mesne conveyances of land so owned by the elder Hugg. A common source of title existing, the question in controversy is whether the *locus* passed with the fishery to the plaintiff, or by other conveyances to the defendant. Judgment having been entered for the plaintiff upon the verdict rendered at the trial, the defendant below brings up with his writ of error a bill of exceptions covering certain rulings made upon the admission of testimony, many portions of the charge of the trial court as well as its refusal to rule and to charge as requested by the counsel for the plaintiffs in error.

An examination of the exceptions upon which error has been assigned, discloses a diversity of legal view concerning the course pursued at the trial that is fundamental in its character. Of thirty-one assignments of error, more than one-half have reference to motions addressed to the trial court

requiring that questions dispositive of the issue between the parties be disposed of by the court by ruling as to the force and effect of documentary proof, or by the direction of a verdict in favor of the plaintiff in error. Inasmuch as the course pursued was contrary to these requests, and resulted in submitting to the jury the several matters raised by the exceptions, it is evident that the judgment recovered can rest upon nothing less than a distinct affirmance of the legal propriety of the judicial conduct in this respect. The nature of the controversy was as follows: The plaintiff below showed in William Hugg the elder, title in fee-simple to land bounded on the west by the river Delaware, and also such title to a fishery in the river as was susceptible of private ownership. He then showed that upon the death of Hugg all of the said real estate was partitioned among his children and grandchildren by proceedings in the Orphans' Court of the county of Gloucester. The record constituting this partition was admitted and called "Division of the Hugg Estate." From this it appeared that the commissioners, in making the division, had set off and allotted to each of the shares a lot or lots of land in severalty; and that to all the heirs in common, and in undivided proportional parts, they had assigned and set off "all the residue and remainder of the real estate held in fee-simple by said William Hugg the elder, consisting of the fishery and two lots of land laid off for the use of the same, as mentioned and numbered on the map hereto annexed." The two lots of land herein mentioned do not concern the present controversy; but the fishery, as assigned and set off by this conveyance, included, the plaintiff contends, a strip of shore land extending back from high water to the land set off in severalty, which line would thus constitute at once the westerly limit of the lots set off in severalty and the "base line" of the fishery. The commissioners concluded their report by certifying that "the foregoing are all the lands and real estate of the said William Hugg the elder, deceased, held in fee-simple in the said county of Gloucester and known unto us whereof we could

make division." The lots set off in severalty were described by the commissioners by metes and bounds, and upon the map filed by them are delineated by a line to the east of and not coincident with the river as shown on the map. The strip of land thus shown between the river and the lots set off in severalty is claimed by the plaintiff below as grantee of the tenants in common, to whom, he contends, it was allotted by the commissioners as real estate following the fishery, and not included in any conveyance in severalty. It is amply established that whatever title in common the Hugg heirs got by this division is gathered up in the plaintiff below, while the title in severalty to those lots that, if extended to the river, would cover the *locus*, is in the defendant Fath. A controlling question, therefore, was whether this title in severalty went to the water—the case of the plaintiff below resting in part upon the failure of any description of the land in severalty to call for the river, or by necessary or even admissible implication to go to the water's edge. The stone wall that now constitutes the westernmost boundary of the *locus in quo* was erected in 1846 or 1847, and does not affect the questions of law now under review.

The Hugg division, in fixing the westernmost line of those titles through which the defendant below makes his claim, uses this language, viz. : "Beginning at a stake on the bank of the river standing north, five degrees east, eleven links from a poplar tree marked as a witness, and runs thence, &c., to the place of beginning." It is clear that this is not a call for the river. The commissioners' map shows a tree, and refers to a stone answering this description, both of which are in the line of the lots conveyed, and not shown as being in or on the river itself. There was also oral testimony as to the location and history of the poplar tree, from which differing inferences as to the position of the stake might be drawn. Upon the Hugg division, therefore, standing alone, the question whether the *locus* was included in the lands set off in severalty, or whether it went with the residue, to be held in common, could not have been decided by the court adversely

to the title that ran back to the tenancy in common.   The submission to the jury of the plaintiff's claim in this respect, was not only proper, but was the only possible way of disposing of the testimony he had offered.   Assuming that it was a question for the jury whether, by the Hugg division, the *locus* went to the grantors of the plaintiff, or to those of the defendant, all questions upon documentary testimony, arising in the courses of these two chains of title, must, if admitted at all, be treated either as transmitting title to one party or the other, or else as limiting or interpreting the title so transmitted either by estoppel, admission or practical location.   Apart from these purposes, the language of mesne conveyances could be possessed of no legal efficacy to increase the estate of a grantee by terms of description more extensive than the title possessed by the grantor.   This was the theory consistently applied by the court below.   The testimony of the plaintiff tended to show continuous user in the chain of his title, in harmony with his contention as to the effect of the Hugg division.   On the other hand, the defendant was permitted to prove his title, and to offer proof with respect to the language used, which he contended was, in some instances, distinct calls for the river Delaware at the *locus in quo.*

The chain of title thus adduced included a deed from the tenants in severalty to Arthur Powell, in 1833, in which, beginning at a corner fixed with relation to the poplar tree, the words "thence along the edge of the Delaware river," are used; also a deed from said Powell to Charles Robb, in 1844, which calls for "a corner on the shore of the river Delaware, and thence along said river," &c.; and also the deed by which the Robb title was conveyed by metes and bounds to Mrs. Fath.

In addition to these sundry other conveyances of interests in the fishery were introduced, in which the terms "in the Delaware river" and "adjacent to the shore," &c., are employed.

Upon the refusal of the trial court to give any binding force to the language of these conveyances, otherwise than as

instruments of proof, to be considered by the jury in connection with the initial partition of the Hugg estate, rests the entire group of exceptions now under review. After careful consideration, the course pursued by the judge who tried the cause meets with our unqualified approval. It was not only the proper mode of directing the trial, but was even more favorable to the defendant than would have been the only other course open to the court, viz., a direction to the jury to the effect that in the state of the proofs, the defendant's predecessors in title could not, by adding to the descriptive terms of their conveyances, enlarge the boundaries of the land conveyed so as to give to their grantees more than the grantors themselves received from the source which lay at the inception of their title, viz., the Hugg division.

It is true that certain of the requests to charge were based upon the language of conveyances which, in the isolated state thus presented, were capable of being treated as proper subjects for interpretation by the court; but, taken in connection with issues to which alone the testimony was relevant, the matter was one of fact for the jury throughout.

The court, in the trial of an issue, is not required to rule upon abstract questions not relevant to the issue or to give direction to the jury with respect to matters not dispositive of the rights of the parties. If the real issue be pointed out to the jury and no competent testimony excluded, the judgment will not be disturbed because of the judicial refusal to adopt some particular mode of presenting the issue or to give undue or conclusive effect to otherwise faultless legal formulæ applicable to a group of facts isolated from the rest of the case.

As an apt illustration of the foregoing, may be cited the eighteenth assignment of error, viz., "that the said court erroneously refused to charge the jury that the call in the deed from Powell to Robb for the shore of the river is equivalent to a call for the ordinary high-water mark." Standing alone, and if dispositive of the issue, this refusal would be of significance, but, taken in connection with the

question submitted to the jury, viz., whether Powell had a title extending to the water, it was clearly the duty of the court to refuse to charge it.

In view of this determination thus reached, it is unnecessary to review in detail the several assignments covering the line of rulings now affirmed. The principle enunciated covers them all, and no error in its application appears to any of the exceptions taken at the trial.

A further assignment of error touching the admission of testimony was one that was argued as if it raised the right of a witness to testify from data obtained from an unproved copy of a coast survey map not in evidence. The question is thus presented by the bill of exceptions: Mr. Harrison, a witness called for the plaintiff, upon his examination-in-chief was about to state the result of certain measurements made with respect to a line described upon a copy of a coast survey map, when an objection was interposed. The judicial certificate then proceeds as follows:

"The Court—I think he can go on and narrate what he did and on what basis. If I think it is incompetent I will rule it out.

"Mr. Pancoast—I object to any statements of this witness based upon data obtained from this government map.

"The Court—I do not rule on that at present.

"Exception by defendant, which is allowed and sealed."

The bill of exceptions thus sealed discloses no legal error. Whether testimony shall be ruled upon before it is actually given, is a matter that rests in sound judicial discretion. In the present instance the trial court simply declined to make any ruling in advance. If the testimony when given proved to be incompetent, the defendant was at liberty to renew his objection and thus to obtain a ruling not resting in discretion or involving the mere order of procedure, but settling the specific question of the competence of the proof. The ruling objected to in this case deprived the defendant of no substan-

tial right. On the contrary, it left him in a position where he could either object to the testimony during its deliverance, or move to strike it out after it had been given, or, if he desired, acquiesce in its presentation. A reversal of the judgment below upon the preliminary ruling would sanction a course by which the defendant might remain silent after incompetent testimony had been given, and then overthrow an adverse judgment upon the ground that the testimony should have been ruled out. Such a course does not commend itself as just, and is not in accord with established practice.

Another assignment calling for special mention concerns an agreement made in 1884, between Frank Fath, the male defendant, and Hugg and others, to whose rights the plaintiff Thompson succeeded. The substance of this agreement is that Fath should pay $50 a year, upon consideration that he be not compelled to comply with an order of the Chancellor adjudging him in contempt. It appears that, in 1883, Fath had erected a wharf or float, the easterly end of which rested on the westerly edge of the stone wall at the *locus in quo.* A bill in equity was thereupon exhibited by Hugg and others, as owners of the fishery, to restrain Fath from erecting and extending this float so as to interfere with the fishing operations of the complainant. In this cause proceedings were had by which Fath was adjudged to be in contempt of an order of the Chancellor, and ordered to pay a fine and costs, and also to remove certain additions he had made to the float in question, so as to put it in the same condition in which it was when a certain order in the cause was made. Fath paid his fine and costs, and then entered into the agreement in question, by which the party of the first part agreed to " forego and give up their rights to have the said building restored to its original condition according to the above-recited order of the court," and they further agreed to " allow said Fath to go on and finish the said building by strengthening the foundations and adding another story thereto in the way and manner contemplated, but not to enlarge the dimensions of the foundations so as to occupy any more space in the river

than the same now does, provided he shall pay for this right and privilege the sum of $50 in advance for each and every year from the date of this agreement until the termination of the said suit." The $50 provided for by said agreement having been paid not only to said Hugg, but also to the plaintiff Thompson after he became the owner of the fishery, and the suit in equity not having been terminated, it was strenuously insisted by the plaintiff in error that this agreement was for "the possession and use of the premises," and an effectual bar to the present action on the part of Thompson, who succeeded to the title of the complainants in the equity suit with knowledge of the agreement. The fallacy in this contention is that it assumes that the parties to this agreement undertook by it to deal with the "possession." Such is not the case. Fath was in possession without reference to the agreement, nor was there any aspect in which the suit in Chancery could challenge his possession or draw his title into controversy. A simple test of the scope of the agreement is to consider the effect of a default by Fath in the payment of the $50 annually in advance. If a right of entry or of maintaining summary proceedings for the possession for non-payment of rent would result, then the contract was one that would, until such breach, bar an action of ejectment; but if, as is undoubtedly the case, the only effect of a breach of the stipulation would be to revive the right to enforce the provisions of the order of contempt, nothing in the nature of a demise can be predicated upon it.

The remaining assignments, namely, those that allege error in the charge of the court in its definitions of the words "shore" and "adjacent," as well as those concerning the riparian lands and their elimination from the consideration of the jury, have been examined, but fail to sustain the allegation of error made concerning them.

This covers the case as made by the exceptions brought up with this writ.

Finding no error, the judgment of the Supreme Court is affirmed.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, GARRISON, GUMMERE, LUDLOW, MAGIE, VAN SYCKEL, BROWN, KRUEGER, SIMS, SMITH, TALMAN. 12.

*For reversal*—None.